## EDWARD C. LUTZER *v.* WASHINGTON SUBURBAN SANITARY COMMISSION

[No. 8, October Term, 1942.]

*Decided November 18, 1942.*

The cause was argued before BOND, C. J., SLOAN, JOHNSON, DELAPLAINE, COLLINS, MARBURY, and GRASON, JJ.

128

*Jerrold V. Powers* and *Robert Peter,* with whom were *Ralph W. Powers* and *Green & Powers* on the brief, for the appellants.

*T. Howard Duckett,* with whom were *James W. Gill* and *Nicholas Orem, Jr.,* on the brief, for the appellee.

GRASON, J., delivered the opinion of the Court.

On March 8, 1940, Huyette Oswald, accompanied by George Blaine Wix, Miss Dorothy Colburn Dennis and Miss Ellen Lutzer, drove his father's automobile, a convertible Pontiac, from College Park, Maryland, to the Bavarian Restaurant in Washington, D. C. They left the restaurant about a quarter past eleven o'clock at night and were returning to a dance at College Park. Oswald was driving and sitting to his right on the front seat was Miss Dennis. Wix sat on the rear seat, immediately behind the driver, and Miss Lutzer was seated to his right. When they had traveled about two miles north of the District line, on New Hampshire Avenue, in Prince George's County, an accident occurred. The automobile sideswiped a ditch digger.

At the point of the accident the Washington Suburban Sanitary Commission was engaged in laying a sewer main along the east side of the road. This ditch digger is a large and cumbersome piece of machinery, dark color, eight feet wide, eight feet high and about ten feet long. It has caterpillar treads and moves under its own power. In front is projected a boom about eighteen to twenty feet long, to which is attached a bucket, which when operated opens and as it closes picks up dirt which is carried to the side of the road. The cab of this digger projects over the caterpillar wheels about six inches. The machine weights about twenty-nine or thirty tons. It was parked at the east side of the road at an angle in such a way that the left rear of the digger projected over the hard surface of the road about four feet. Fifty-five feet north of the digger was an open ditch. The

Commission was carrying a line of pipe from that point to the west side of the road. They dug the trench for the pipe across the road from the west side, had completed the installation up to four feet of the east side at closing time, and the next day they were going to complete laying pipe under the road by extending it through this open ditch to the east side. A few feet north of the digger was a pump which was partly on the hard surface of the road and partly on the shoulder.

The uncontradicted testimony in this case establishes the fact that for fifty feet (and one witness said it was seventy-five feet) from the digger, as you approached it traveling north, was a series of lights that gradually extended out on the road up to and past the end of this digger and on down to the open ditch in the road. These lights ran about two feet from the corner of the digger and immediately next to them, parallel to the road and following the lights, was a barricade, consisting of units, about three and a half feet high, connected together, from which were suspended a number of red lanterns. From these lights to the west side, the road was entirely open for twelve feet. For one-half mile, south of the machine and as you approach it, the Gas Company placed pipes. These pipes were off the road for about ten feet, were about thirty feet in length and each was lighted by a red lantern on each end and one in the middle. All of these lights, both of the Gas Company and of the Commission, the testimony shows, were lit at the time of the accident. Immediately behind the digger, for its entire width, red lanterns were burning.

As you approach this digger, traveling north, there is a hill about two hundred feet long and thence a level stretch, or bottom, and thence another hill arises. As you ascend the second hill there is a gradual curve. This ditch digger was parked about where the curve starts. Down the hill, for its entire length, the Gas Company pipes were lit and for fifty or seventy-five feet as you approach the digger the red lanterns placed in the road by the Commission were gradually projected so as to

guide traffic around the digger. New Hampshire Avenue is twenty feet wide; the night clear and the surface dry.

When Oswald got to open country he drove from forty-five to fifty-five miles an hour. The speed limit at that time was fifty miles an hour. When he started to descend this hill he took his foot off the accelerator and his car coasted down. One of the witnesses said: "It gathered speed." Miss Lutzer, about this time, rose up from the seat and one witness stated she was either looking at the speedometer or warning the driver, but what she said was not understood. Oswald testified: "The first of those red lights was about four hundred yards I judge from the scene of the accident. * * * the lights were just off on the right side of the concrete portion on the dirt, probably about two feet off. * * * I was going about fifty miles on hour. * * * I would estimate the lights were ten feet apart. * * * The ditch digger was about three or four hundred feet from the bottom of the incline. * * * Having run along with them for some distance I considered that they continued on at the side of the road. That was the visible impression that I got of the conditions. My headlights didn't show up anything out of the ordinary in the road. Then at the split second before the crash came, I became aware there was something out of the ordinary in front of me." The car sideswiped the digger, causing Miss Lutzer to be seriously and permanently injured.

When witnesses arrived at the scene shortly after the accident, broken glass was scattered over the road, the barricade had been smashed and knocked aside; the large pump in front of the digger had been knocked over and broken and the automobile traveled some distance north, slowed around and came to rest facing south, that is, in the opposite direction from which it was traveling.

These are the main and pertinent facts. Thereafter two suits were instituted in the Circuit Court for Prince George's County, each against Huyette Oswald and Edward Ingram Oswald, his father, and the Washington Suburban Sanitary Commission. One suit was brought

by the father of Ellen Lutzer, for medical care and attention and hospital bills, and the other by Ellen Lutzer, an infant, through her father, Edward C. Lutzer. These cases were consolidated, removed to the Circuit Court for Montgomery County, and there tried. As against Edward Oswald a judgment of *non pros.* was taken in each case. The cases proceeded against the other defendants were submitted to the jury, resulting in verdicts in favor of each plaintiff. The Commission, at the trial, submitted in each case two prayers, one challenged the legal sufficiency of the evidence to entitle the plaintiff to recover; the second prayer sought instruction that there was no evidence in the case of any negligence on the part of the Commission, in the discharge of its legal obligation to the plaintiff, as to entitle the plaintiff to recover. These prayers the court reserved. The Commission filed a motion to strike out the verdict and to enter a judgment for it notwithstanding the verdict and at the same time filed a motion for a new trial. The court thereafter granted the motions and entered up judgment in each case in favor of the Commission; at the same time granted a new trial in the event this court reversed its action in striking out the verdict and entering a judgment for the Commission. From this action of the court the plaintiff in each case appeals.

It is charged in each declaration that the defendant negligently and carelessly placed a ditch-digging machine in such a position as to project three feet eight inches on the paved portion of the highway. In deciding this question we must take into consideration all the facts and circumstances attending the happening of the accident. And we must not overlook the fact that the Commission in its operation in laying sewer pipes along that road was engaged in a perfectly lawful and necessary public improvement. It had a right to use this digger for the purpose, and it cannot be ruled that modern machinery must not be substituted for old and archaic methods. It is obvious, in performing such work, at the end of a day some portion might not be completed. What should a

contractor do in such a situation? In this case this large, heavy and cumbersome piece of machinery, difficult to move, was, when work closed down on the evening of March 8, 1940, in a position from which it could be operated on the work the following morning. To the right of it was a steep bank and between it and the bank were piled these large mains. The only evidence in the case that the digger could have been moved entirely off the road at that point was that of a former policeman who said he thought it could. Was it the duty of the Commission to move this machine to a place away from this work, notwithstanding the lights and barricades with lights suspended thereon, all of which were lit at the time of the accident? These lights extended to the rear of the machine, and from a point fifty to seventy-five feet south of the machine red lights were placed on a gradual angle up to two feet west of the digger in order to guide traffic to the twelve feet of the open and unobstructed part of road between the digger and the west side of the road. For a half a mile north of the scene of the accident red lights on the pipes of the Gas Company were lit. The Commission was required to exercise a high degree of care and caution to place its machine in the most practical place to prevent harm to the users of the road, and in determining whether it did use such care one must take in consideration the lights of the Gas Company and the lights which were placed in order to call attention of users of the road of danger ahead and to guide them safely through the open portion of the road.

"And if the obstruction is unnecessary, or if it subjects persons in the lawful use of the street to unnecessary dangers, or if it is maintained for an unreasonable length of time, it cannot be justified * * *." State v. Coal Co., 150 Md. 429, 440, 133 A. 601, 605.

Can it be reasonably said in this case that the obstruction was unnecessary or under the circumstances here subjected persons in the lawful use of the road to unnecessary dangers, or that it was maintained for an

unreasonable length of time? To answer this question in the affirmative would make every contractor an insurer and discourage those now engaged in works of public necessity from engaging in such enterprise.

In the case of *Sinclair v. Baltimore,* 59 Md. 592, 598, an ordinance permitted placing building material in a street in front of a lot where a building was in the course of erection, and required during the night the material so placed shall be designated by displaying a lighted lamp or lantern at such part of the same as to be easily observed by persons passing along the street. A light so placed at night went out, and the plaintiff ran his buggy over or against the pile of material and was injured, his horse killed, and his buggy broken. Judge Alvey in that case said: "It is true, the public have a right to the free passage of the streets, but yet that right cannot at all times be enjoyed entirely free of obstruction. For purposes of improvement in cities and towns, streets, *from necessity, must sometimes be at least partially obstructed;* and all that can be done to prevent accident, is *the deposit of the material in a reasonable place, and to place guards,* or give reasonable precautionary signals, to warn the public." (Italics supplied.)

In the case of *McCarthy v. Clark,* 115 Md. 454, 462, 81 A. 12, 15, a lady walking on the sidewalk on the west side of Broadway, in Baltimore city, at night, carrying one child and leading by the hand another child, fell over a frame for a manhole. There was no light on it. The manhole frame was intended to be delivered on the east side of the street, where the city was building a sewer. The court held that this frame was misplaced as it should have been placed on the east side of the street where the work was being done; and Judge Urner quoted from the Sinclair case, *supra*: Their duty was to "deposit the material in a reasonable place" as well as to "place guards or give reasonable precautionary signals to warn the public." From these and other authorities, which we have examined, the appellants advance the theory that in determining whether the defendant com-

mitted primary negligence we must disregard the lights along the road that night, placed there as "precautionary signals to warn the public" in so far as they affect the question of the reasonableness of the placement of this ditch digger on the night of the accident. In other words, we must treat this case in the same way as we would had there been no lights at all at the time of the collision. We do not think the cases cited support this theory and to such doctrine we cannot subscribe.

It is hard to conceive these lights placed by the Commission could not have been seen in time to prevent a collision with the digger by one exercising due care and caution in operating an automobile over that road. And the Gas Company's lights should have prompted caution. There was no duty which compelled the Commission to anticipate and provide against the action of the careless and heedless. To impose such a duty upon the Commission would make it an insurer against harm to all persons using the highway, including the careful and cautious and the careless and heedless alike.

We are of the opinion that there was no evidence in these cases legally sufficient to show primary negligence on the part of the Commission and each case should have been withdrawn from the jury at the conclusion of the evidence. But this error becomes harmless, as the court's conclusion on the motion filed in each case by the Commission to strike out the verdict and enter up a judgment in each case for the Commission was correct.

*Judgments in each case affirmed, with costs to appellee.*